Melinda Jane Steuer (SBN: 216105)
The Law Offices of Melinda Jane Steuer
1107 Second Street, Suite 230
Sacramento, CA 95814
Telephone: (916) 930-0045
Facsimile: (916) 314-4100
msteuer@californiainvestoradvocate.com

Attorneys for Plaintiff
Carl E. Nelson

# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARL E. NELSON, an individual,<br><br>    Plaintiff,<br><br>vs.<br><br>PHH MORTGAGE CORPORATION, successor by merger to OCWEN LOAN SERVICING, LLC, a foreign corporation,<br><br>    Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1) **FRAUD-INTENTIONAL MISREPRESENTATION;**<br>2) **NEGLIGENT MISREPRESENTATION;**<br>3) **FRAUD-OMISSIONS;**<br>4) **VIOLATION OF CALIFORNIA CIVIL CODE § 2923.6;**<br>5) **VIOLATION OF CALIFORNIA CIVIL CODE § 2923.7;**<br>6) **VIOLATION OF CALIFORNIA CIVIL CODE § 2924.10;**<br>7) **VIOLATION OF REAL ESTATE SETTLEMENT PROCEDURES ACT ("RESPA"); AND**<br>8) **NEGLIGENCE**<br><br>**UNLIMITED JURISDICTION**<br><br>**JURY TRIAL DEMANDED** |

1 | Plaintiff, Carl E. Nelson, alleges:

2 | **ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

3 | 1.  Plaintiff is informed and believes, and thereon alleges, that Defendant PHH
4 | Mortgage Corporation, successor by merger to Ocwen Loan Servicing, LLC ("PHH") is, and at
5 | all times relevant was, a foreign corporation doing business throughout the State of California.

6 | 2.  Plaintiff is informed and believes, and thereon alleges, that PHH merged with
7 | Ocwen Loan Servicing, LLC ("Ocwen") on or about August of 2019.  Plaintiff is informed and
8 | believes, and thereon alleges, that Ocwen ceased to exist as a separate entity when it merged
9 | with PHH on or about August of 2019.  Plaintiff is informed and believes, and thereon alleges,
10 | that Defendant PHH is the successor in interest to Ocwen.

11 | 3.  Plaintiff is informed and believes, and thereon alleges, that Ocwen, at all times
12 | relevant, was a mortgage loan servicer who serviced loans throughout the State of California,
13 | including the loan on Plaintiff's property which is at issue herein.

14 | 4.  The District Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332.

15 | 5.  PHH's/Ocwen's liability, alleged herein, arose in the County of Sacramento.
16 | Plaintiff's damages occurred in the County of Sacramento.  The misrepresentations and material
17 | omissions alleged herein were made to Plaintiff in the County of Sacramento, through phone
18 | calls to Plaintiff in the County of Sacramento, and in documents delivered to Plaintiff in the
19 | County of Sacramento.  The breaches of duty and violations of statutes alleged herein relate to
20 | and affected real property that is located in the County of Sacramento.  For each and all of those
21 | reasons, venue in the Eastern District of California is appropriate.

22 | 6.  On or about March 12, 2004, Plaintiff took out a mortgage loan in the principal
23 | amount of $381,000.00 from Homecomings Financial, LLC. ("the Loan").  The Loan was
24 | secured by a deed of trust on real property located at 2062 Empire Mine Circle, Gold River, CA
25 | 95670 ("the Property").  The Loan, at all times since its inception, was a first lien mortgage and
26 | deed of trust secured by owner-occupied real property consisting of one dwelling unit.

27 | 7.  On or about December 8, 2008, Plaintiff and Homecomings Financial, LLC entered
28 | into a loan modification agreement.  The new unpaid principal balance was $383,974.99.

1      8.  On May 16, 2009, Plaintiff filed for Chapter 13 bankruptcy.

2      9.  The last payment that was made on the Loan, prior to the conclusion of

3   Plaintiff's bankruptcy, was on June 17, 2009.

4      10.  On or about July 1, 2009, the servicing of the Loan was transferred to GMAC

5   Mortgage, LLC ("GMAC").

6      11.  On or about September 11, 2009, Plaintiff's bankruptcy was converted from a

7   Chapter 13 to a Chapter 11.

8      12.  While Plaintiff's bankruptcy was pending, and prior to the approval of his

9   Chapter 11 bankruptcy plan, he was not allowed to make any payments to creditors, including

10  on the Loan. His bank account was also frozen pursuant to court order during that time.

11     13.  Plaintiff's Chapter 11 bankruptcy plan was approved on December 23, 2010. At the

12  time, the Loan was owned by the Bank of New York. The claim of the Bank of New York was

13  allowed as a secured claim, and identified as class 2.14 on page 3 of the Plan. At page 5 of the

14  Plan it states: the secured claim amount is $383,421.00; the arrearages on the Loan will be paid

15  over 60 months at 7% interest; the remaining claim shall be cured and reinstated at the non-

16  default contract payment; and the total estimated monthly payment for the contract rate plus the

17  arrearages is $3,000.00 a month. Plaintiff was subsequently told that the arrearages were to be

18  paid at the original loan interest rate of 5.875%.

19     14.  After the bankruptcy plan was approved, Plaintiff paid the arrearages and made the

20  monthly payments on the Loan as provided for in his Chapter 11 bankruptcy reorganization

21  plan. Specifically, in February 2011, the monies that were in Plaintiff's bank account were

22  released with the approval of the bankruptcy court. In February of 2011, Plaintiff made a loan

23  payment of $2,434.06. In March and April of 2011, Plaintiff made loan payments of $3,500.00

24  to make up for the difference. In May of 2011, Plaintiff made a loan payment of $3,400.00. In

25  June of 2011, GMAC changed the monthly payment amount to $3,070.60. Plaintiff made

26  monthly payments of $3,070.60 on the Loan from June 2011 until May of 2012, when GMAC

27  changed the payment amount to $3,099.55. Between May of 2012 and February of 2013,

28  Plaintiff made monthly payments of $3,099.55 on the Loan. Based on Plaintiff's confirmed

bankruptcy plan, it was his understanding that $2,434.06 of the payments he made on the Loan were to be applied to the current month in which the loan payment was made, and that the remainder of those payments were being applied to the arrearages.

15. On or about February 13, 2013, Ocwen began servicing the Loan. Plaintiff continued to make the monthly payments on the Loan pursuant to the bankruptcy reorganization plan. Plaintiff made monthly payments of $3,099.55 on the Loan to Ocwen in March of 2013 and April of 2013. In May 2013, Ocwen increased the monthly payment to $3,300.36. Plaintiff was not provided with any explanation for this increase in the monthly payments. This increase in the monthly payments was not authorized by Plaintiff's confirmed bankruptcy plan. However, Plaintiff did not believe that this increase in the monthly payments justified the expense of paying his bankruptcy attorney to challenge them. Plaintiff therefore made monthly payments to Ocwen of $3,300.36 a month from May of 2013 through August of 2013.

16. While GMAC was servicing the Loan, Plaintiff had received an offer in writing from GMAC's home loan assistance program to lower his existing interest rate from 5.875% to 2.875%. No loan modification documents were required for this offer. However, when Ocwen took over the servicing of the Loan, it informed Plaintiff that it would not honor GMAC's offer and that he would be required to fill out a complete loan modification package. Accordingly, on August 30, 2013, Plaintiff submitted a complete loan modification package to Ocwen. Ocwen never acted on or responded to Plaintiff's loan modification application. Ocwen also never advised Plaintiff that his application was incomplete, or that additional documents were required in order for it to process his application. Plaintiff is informed and believes, and thereon alleges, that his loan modification application was complete, and that he would have qualified for a loan modification at that time.

/ / /

/ / /

/ / /

/ / /

/ / /

17. In August of 2013, Plaintiff also had verbal conversations with Ocwen about obtaining a loan modification at a 2% interest rate. The proposed 2% interest rate was consistent with a modification Ocwen had approved for another loan it was servicing on behalf of Plaintiff on a different property, which had also greatly reduced the principal amount owed. As stated above, Ocwen never acted on or responded to Plaintiff's August 30, 2013 loan modification application.

18. In September of 2013, Plaintiff tried to make his monthly mortgage payment online, as he had done with every other mortgage payment since Ocwen had become the loan servicer, but was unable to do so. Plaintiff made multiple phone calls to Ocwen's 800 number in September and October of 2013 because he continued to be unable to pay the mortgage through its online system. Initially, Plaintiff was told that he could not make payments because of his bankruptcy. Plaintiff responded that his bankruptcy had concluded, his bankruptcy plan had been confirmed, and he had been making loan payments since February of 2011. Plaintiff was also told that he should try to contact an attorney named Les Zieve for assistance. Plaintiff called Mr. Zieve's office, but was told that his office did not represent Ocwen in his case and that he would need to contact Ocwen.

19. As of mid-October 2013, Plaintiff was still unable to make payments through the Ocwen website. The website indicated that his loan was closed. The history of payments on the website showed "service released" on September 2, 2013, a loan balance of $0.00 as of October 16, 2013, and that no payment was due. When Plaintiff called Ocwen's automated system after August of 2013, he received a recorded message stating that no payment was due. Eventually, Plaintiff reached a representative at Ocwen who told him that no payment was due because his loan had been zeroed out due to a global settlement with the government. Plaintiff asked Ocwen to supply him with written proof of the foregoing. In October of 2013, Ocwen sent Plaintiff a statement ("the Ocwen Statement). A true and correct copy of the Ocwen Statement is attached hereto as Exhibit 1 and expressly incorporated by reference as if fully stated herein. The Ocwen Statement reflects that $365,471.90 was applied to Plaintiff's loan

/ / /

principal on September 2, 2013, various other fees relating to the Loan were waived effective
September 2, 2013, and the balance due on the loan as of October 16, 2013 was $0.00.

20. Around January of 2014, Plaintiff received an IRS Form 1098 mortgage interest
statement for 2013 from Ocwen ("2013 Form 1098"). The 2013 Form 1098 states that principal
of $370,518.25 was paid on the Loan in 2013. A true and correct copy of the 2013 Form 1098
is attached hereto as Exhibit 2 and expressly incorporated by reference as if fully stated herein.
Plaintiff provided the 2013 Form 1098 to his tax preparer to utilize in the preparation of his
2013 tax return.

21. Plaintiff did not receive an amended Form 1098 mortgage interest statement for
2013 from Ocwen. Plaintiff did not receive any Form 1098 mortgage interest statements from
Ocwen for 2014, 2015, 2016 and/or 2017. Nobody from the Internal Revenue Service or the
Franchise Tax Board ever contacted Plaintiff to indicate that there were any errors in his 2013-
2017 tax returns.

22. Plaintiff reasonably believed Ocwen's statements that his loan had been zeroed out
due to a regulatory settlement because he had read in the news that there were regulatory and
class action settlements against Ocwen and other loan servicers which had occurred around
2013; he had received a written account statement which reflected that a zero balance was owed
on his loan as of October 2013; and Ocwen had filed an official tax form for 2013 which
reflected a full principal payoff of his loan. Plaintiff's belief that his loan had been zeroed out
was further bolstered when he received no further communication from Ocwen or anybody else
about the Loan between October of 2013 and March of 2016.

23. Around March 15, 2016, Plaintiff received a message from his bankruptcy attorney
indicating that he needed to contact an attorney named Matthew Clark, III about his loan.
Plaintiff sent Mr. Clark an email on March 20, 2016, asking him to please clarify what the
problem was. Plaintiff indicated in his email that his loan with Ocwen was zeroed out around
September/October 2013 and that he had not been contacted by anybody regarding a delinquent
loan or foreclosure. On March 25, 2016, Mr. Clark sent Plaintiff an email requesting that his
attorney email him with confirmation that he could discuss Plaintiff's bankruptcy account with

1  him.  Plaintiff responded that this was not a bankruptcy issue and asked him to tell him what the
2  problem was.

3      24.  On May 4, 2016, Mr. Clark emailed Plaintiff again, indicating that he had to resolve
4  this matter that month and that he needed to hear from him.  Plaintiff stated that he had
5  responded to him on April 6, 2016 and that he would re-send the email.  On May 10, 2016, Mr.
6  Clark also asked Plaintiff who was paying the taxes and maintaining the insurance on the
7  property.

8      25.  On May 7, 2016, Plaintiff re-sent his April 6, 2016 email to Mr. Clark.  Plaintiff's
9  April 6, 2016 email detailed the events described above, including his communications with
10  Ocwen in which he had been told that his loan balance was zero and no payments were due
11  because it was part of a global government settlement, and that he had received the Ocwen
12  Statement stating that his loan balance was zeroed out as of October 16, 2013.  Plaintiff attached
13  a copy of the Ocwen Statement to his email.  Plaintiff also stated to Mr. Clark that he was
14  current on his homeowners insurance and property taxes.  Plaintiff indicated that he found it
15  very strange that he was hearing from him after receiving no contact from Ocwen since October
16  of 2013.  Plaintiff therefore asked Mr. Clark to clarify who he represented.

17      26.  Mr. Clark responded to Plaintiff that he represented Ocwen.  He attached an
18  amortization table and payoff quote for the Loan to his email.  The amortization table which he
19  attached went back to 2011 and tabulated interest charges as if no payments had been made
20  since 2011.  The payoff quote stated that Plaintiff owed Ocwen over $500,000.00 in principal
21  and interest.  Mr. Clark also stated to Plaintiff that his account would remain escrowed for taxes
22  and insurance.  Mr. Clark indicated that the Ocwen Statement was not a zeroing out of
23  Plaintiff's loan.  Plaintiff responded with a request for an accounting.  Plaintiff never heard
24  from Mr. Clark or anyone from his firm again.  Ocwen never filed a Notice of Default with
25  respect to the Loan.  Plaintiff received no correspondence from Ocwen regarding loss mitigation
26  alternatives.

27  ///
28  ///

27. As a result of Mr. Clark's emails, Plaintiff contacted the California state attorney general's office for their advice on what he should do. They recommended that Plaintiff enlist the help of Senator Barbara Boxer. Plaintiff sent Ms. Boxer a letter on May 18, 2016 explaining the situation. He enclosed the Ocwen Statement and Mr. Clark's email with the attached amortization table and payoff quote.

28. Ms. Boxer's office suggested that Plaintiff file a complaint with the Consumer Financial Protection Bureau ("CFPB"). Accordingly, Plaintiff filed an online complaint with the CFPB on May 20, 2016.

29. On June 24, 2016, Plaintiff received Ocwen's response to his complaint. In its response, Ocwen asserted that the Ocwen Statement did not reflect a payoff of his loan and that it had been generated due to a system conversion. Ocwen did not provide any explanation as to why it had also filed the 2013 Form 1098 which reflected a principal payoff of $370,518.25. Ocwen also asserted that it had sent Plaintiff monthly account statements in October, November, and December 2013, but admitted that it had not sent him any communications after December of 2013. In fact, Plaintiff had not received any statements from Ocwen after the October 2013 Ocwen Statement. Ocwen also stated that it had not received documents that were needed to review the loan modification application that Plaintiff had submitted on or about August 30, 2013, but did not specify what the missing documents were. That was the first time Plaintiff had heard or been notified that Ocwen had deemed his loan modification application to be incomplete. In fact, Plaintiff's loan modification application included all of the required documents.

30. Plaintiff did not believe that the statements in Ocwen's response to his CFPB complaint were reliable or credible because they contained so many falsities and unexplained issues, as described above. Plaintiff therefore determined that his best course of action would be to respond to Ocwen's response so that the CFPB could investigate further. On October 24, 2016, Plaintiff advised the CFPB and Ms. Boxer's office that he had recently become aware of Ocwen's reply to his complaint and was in the process of preparing a response, but kept getting sidetracked by health issues. Plaintiff explained that he had been in and out of the hospital 4

1 | times in the last 5 weeks, and in and out of the hospital a total time of 10 times since March

2 | 2016. Plaintiff therefore requested additional time to respond.

3 |     31. On November 10, 2016, Plaintiff received a letter from Ocwen stating that it had

4 | purchased insurance for his property and added that cost to the amount owed on the Loan. That

5 | was the first and only communication Plaintiff ever received from Ocwen which indicated that

6 | it had force-placed insurance on the property. Plaintiff responded to Ocwen that same day to

7 | advise it that he had homeowners insurance and had always had homeowners insurance and

8 | therefore Ocwen's insurance was not required. Plaintiff also stated that he had told Ocwen's

9 | attorney, verbally and in writing, that he had homeowners insurance. Plaintiff attached a copy

10 | of the declaration pages from his policy which confirmed that he had homeowners insurance

11 | and that the policy was paid through July 1, 2017. In addition, Plaintiff advised Ocwen that he

12 | was in the process of responding to its prior letter but kept getting delayed with health issues.

13 |     32. The servicing of the Loan was transferred from Ocwen to Nationstar, n/k/a Mr.

14 | Cooper ("Nationstar"), on April 1, 2017. Between April of 2017 and August of 2017,

15 | Nationstar sent Plaintiff statements which indicated that he still owed $365,471.90 in principal

16 | on the Loan. Starting around mid-August 2017, Plaintiff began receiving phone calls from

17 | Nationstar. However, the phone calls did not indicate who was calling or why they were

18 | calling. When Plaintiff tried to return the calls, he was unable to reach a live person.

19 |     33. On August 16, 2017, Plaintiff submitted a response to Ocwen's letter of June 14,

20 | 2016. By this time, Senator Boxer had retired. Plaintiff therefore submitted it to Senator

21 | Feinstein's office, as well as to the CFPB. Plaintiff explained that he had been in and out of the

22 | hospital 35 times since March 2016. Plaintiff responded in detail to each of the points in

23 | Ocwen's letter.

24 |     34. On or about November 16, 2017, Rushmore Loan Management Services, LLC

25 | ("Rushmore") became the loan servicer for the Loan.

26 | ///

27 | ///

28 | ///

1    35. On or about May 21, 2018, Plaintiff received a response from Ocwen (dated April
2    18, 2018) to Plaintiff's August 16, 2017 letter that he had submitted to the CFPB. Plaintiff
3    responded back to Ocwen through the CFPB on June 11, 2018. Ocwen never responded to
4    Plaintiff's June 11, 2018 letter.

5    36. Between January of 2018 and November of 2018, Plaintiff received numerous voice
6    messages from various people who worked for Rushmore. Plaintiff returned those calls as
7    promptly as he was able. Plaintiff was only able to reach a live person on one occasion,
8    November 6, 2018. On that date, Plaintiff was routed to a loan caseworker. This individual
9    went through a verification process to confirm his identity. She logged into Rushmore's
10   computer system and pulled up his account to see why he was being contacted. She then told
11   Plaintiff that his loan was paid in full. To make sure there was no misunderstanding, Plaintiff
12   asked her if she could repeat that. She again told Plaintiff that his loan was paid in full.

13   37. Throughout 2018, Plaintiff received multiple letters from Rushmore indicating that
14   the Loan was in arrears and offering loss mitigation alternatives. Plaintiff contacted Rushmore
15   in writing on multiple occasions in the fall of 2018 to notify it that the Loan was not in arrears
16   because it had been zeroed out by Ocwen on September 2, 2013, as described above. Plaintiff
17   also attached supporting documentation, including the Ocwen Statement. Much to Plaintiff's
18   surprise and disappointment, Rushmore stated in written correspondence that the Loan was
19   active and that he had been in arrears on payments since September 1, 2011. Plaintiff
20   reasonably believed that the statements that the Loan was active were not accurate because of
21   the Ocwen Statement, the 2013 Form 1098, the verbal representations from Ocwen's agent with
22   whom he had spoken, and the verbal statements from the only person at Rushmore who he had
23   been able to reach. Plaintiff also knew that he had not been in arrears on payments since
24   September 1, 2011 because he had made payments in accordance with his bankruptcy
25   reorganization plan up through August of 2013.

26   / / /
27   / / /
28   / / /

38. Although Plaintiff believed that the Loan had been zeroed out in September of 2013, he was also concerned about the correspondence he was receiving from Rushmore. Specifically, Plaintiff was concerned that Rushmore would foreclose on his house before he had the chance to get to the bottom of the situation and convince Rushmore that he was not in arrears and that a horrible mistake had been made. Accordingly, Plaintiff submitted a loan modification application to Rushmore in late October of 2018.

39. On or about January 4, 2019, Plaintiff received a letter from Rushmore stating that it had closed the file on Plaintiff's loan modification request on December 3, 2018 because documents were allegedly missing and had not been supplied by the due date. This letter enclosed several other letters purportedly sent to Plaintiff, which he had not actually received.

40. On or about January 10, 2019, Plaintiff began receiving phone calls from people offering to help him keep his residence. Plaintiff picked up his mail that same day, and saw that there was a letter from Quality Loan Service Corp. dated December 28, 2018, which stated that it was starting foreclosure proceedings. This letter also stated that the amount of the debt was $593,575.00, more than two hundred thousand dollars than the amount of Plaintiff's original loan. Plaintiff also received a letter from a realtor on January 10, 2019, stating that a Notice of Default had been filed on Plaintiff's home on January 2, 2019.

41. On February 13, 2019, Plaintiff filed a complaint against Rushmore in the Sacramento County Superior Court seeking a temporary restraining order, a preliminary injunction, and a permanent injunction to stop the foreclosure process on his property. The court granted the temporary restraining order and scheduled the hearing on Plaintiff's motion for a preliminary injunction for July 1, 2019. On July 1, 2019, the court continued the hearing on Plaintiff's motion for a preliminary injunction so that Plaintiff could conduct discovery.

42. Plaintiff promptly served discovery requests on Rushmore and issued document subpoenas to Ocwen, Nationstar and his telephone carrier Comcast. Rushmore produced its loan file for the Loan in early August of 2019. When Plaintiff and his counsel reviewed the loan file, they learned that: a) there were no records in the loan file of the Ocwen Statement or the 2013 Form 1098; b) there were no records in the loan file of the loan modification

application Plaintiff had submitted to Ocwen on August 30, 2013 or that Ocwen had ever reviewed that application or sent Plaintiff any response to it; c) there were no records in the loan file of Plaintiff's bankruptcy plan or its provisions; d) there were no records in the loan file that Ocwen had any systems conversion, and/or that a systems conversion had caused Ocwen to generate the Ocwen Statement and/or the 2013 Form 1098; e) Plaintiff's post-bankruptcy loan payments had been misapplied in a manner that violated his bankruptcy plan and caused the purported arrears to be significantly larger than they actually were; f) there were numerous letters to Plaintiff from Ocwen in the file with various dates between November 2013 and March 2017 which stated that his loan was past due and that it required proof of insurance, none of which Plaintiff had ever received; g) Ocwen had force-placed insurance on the property at an exorbitant cost between October of 2013 and March of 2017 and added those costs to the loan balance h) there were dozens of "property inspection fees" dating back to 2011 that had been added to the loan balance, even though the Property is located in a gated community and therefore cannot be "inspected" without Plaintiff's knowledge or consent, which was never granted; i) there were numerous other unexplained and unwarranted charges that had been added to the loan balance prior to Nationstar or Rushmore becoming the loan servicer, including items labeled as "bankruptcy" fees and "foreclosure" fees; j) Ocwen had added attorneys fees for unspecified services to the loan balance; k) Ocwen had referred the Loan to foreclosure prior to transferring the Loan to Nationstar; and l) there were no records indicating that Ocwen had done any investigation with respect to the complaint that Plaintiff had filed with the CFPB.

43.  As stated above, Plaintiff has always had homeowners insurance on his property. Plaintiff had also promptly provided proof of insurance on the one and only occasion when Ocwen had notified him that it required proof of insurance.  Plaintiff had received no other notifications from Ocwen or anyone else that it required proof of insurance or believed that insurance was lacking.

44.  Plaintiff was shocked by the foregoing discoveries in Rushmore's loan file. However, Plaintiff did not know at that time whether the missing or incomplete information was attributable to Rushmore, or to Ocwen, or to Nationstar.

45. In August of 2019, Rushmore denied Plaintiff's application for a loan modification on the grounds that his income and assets were insufficient to make a loan modification feasible given the current balance owed on the Loan. Plaintiff is informed and believes, and thereon alleges, that the loan balance had ballooned due to late fees and default interest that had been charged on the loan going back to September of 2011, the failure to properly apply Plaintiff's post-bankruptcy loan payments, the homeowners insurance that had been force-placed on Plaintiff's property and added to the loan balance, and the property inspection fees and other unexplained charges that had been added to the loan balance.

46. In Sept of 2019, Nationstar produced its loan file for the Loan. Nationstar's loan file was identical to Rushmore's loan file up through the date when Nationstar transferred the loan. Plaintiff therefore ascertained that Ocwen had failed to include critical documentation pertaining to the Loan in the files that it transferred to Nationstar, and that Ocwen provided inaccurate and misleading information to Nationstar, who then passed that same information along to Rushmore.

47. Ocwen failed to comply with Plaintiff's subpoena, thereby requiring Plaintiff to file a motion to compel. The court ordered Ocwen to comply with the subpoena by October 17, 2019. Ocwen produced some documents on October 17, 2019, but failed and refused to produce many of the documents Plaintiff had requested. Specifically, Ocwen did not produce any Form 1098 mortgage interest statements (including the 2013 Form 1098), or the Ocwen Statement, or any documents reflecting or evidencing the purported systems conversion which it had told the CFPB was the cause for the generation of the Ocwen Statement. Ocwen also refused to produce any class action settlements and/or settlements with regulators which encompassed mortgage loan holders in California whose loans were serviced by Ocwen during the same time frame in which Ocwen claimed to have serviced Plaintiff's loan. Ocwen's counsel subsequently advised Plaintiff's counsel that it did not have any additional documents regarding the alleged systems conversion other than what it had produced. In fact, no documents regarding the alleged systems conversion were produced.

/ / /

48. While Plaintiff's lawsuit against Rushmore was pending, Plaintiff's counsel also did independent research to see what information regarding lawsuits involving Ocwen was publicly available. Plaintiff's counsel ascertained that there was a settlement between regulators and Ocwen around the end of 2013 which entailed principal payoffs of first lien residential home mortgages and that, in some cases, Ocwen would contact borrowers directly regarding principal reductions. Plaintiff's counsel also found a Consent Judgment filed February 26, 2014, in an action filed against Ocwen by the CFPB and others which stated that Ocwen had agreed to provide $2 billion of relief to consumers through the immediate forgiveness of principal on first lien residential mortgage loans to borrowers who meet certain criteria stated therein.

49. Plaintiff's counsel also ascertained that there were multiple other instances in which regulators had found that Ocwen had engaged in misconduct similar to what had happened to Plaintiff. Specifically, in January of 2015, Ocwen entered into a Consent Order with the California Department of Business Oversight ("CDBO") based on allegations that Ocwen had violated numerous federal and state regulations. Ocwen's alleged violations included: mailing letters to borrowers after the dates listed on the letters; failing to send written denial notices to California borrowers who applied for loss mitigation alternatives; incorrectly informing delinquent California borrowers that they were current on their mortgage payments; failing to provide written notice regarding documentation missing from a borrower's incomplete loan modification application, including income documentation; failing to send written loan modification denial notices to borrowers; failing to provide California borrowers with a written decision explaining the denial of each available loss mitigation alternative; sending borrowers inaccurate and untimely notices; failing to send required notices to California borrowers who were more than 45 days late on their mortgage payments; and sending notices which contained incorrect delinquent payment amounts or misstated the total amounts due.

50. Plaintiff's counsel also located a complaint filed by the CFPB against Ocwen on April 20, 2017 that was amended around the spring of 2019. This complaint alleges that Ocwen improperly calculated loan balances, misapplied borrower payments, failed to correctly process escrow and insurance payments, wrongfully charged premiums for hazard insurance, failed to

1  properly investigate and make corrections in response to consumer complaints, and sold loan

2  servicing rights to servicers without fully disclosing or correcting errors in borrowers' loan files.

3      51. In addition to the foregoing, Plaintiff's counsel conducted a PACER search in

4  October 2019 for cases in federal court involving Ocwen. That search returned 548 case results.

5  Plaintiff's counsel also searched the CFPB website for complaints against Ocwen. That search

6  revealed that over 10,000 complaints had been filed against Ocwen with the CFPB. Plaintiff's

7  counsel therefore determined that she would need to file a second motion to compel against

8  Ocwen for the regulatory and class action settlements which it had refused to produce.

9  Plaintiff's counsel filed a second motion to compel in mid-November of 2019.

10      52. On Nov 25, 2019, the court denied Plaintiff's motion for a preliminary injunction

11  against Rushmore, thereby paving the way for Rushmore to foreclose on Plaintiff's property.

12  At oral argument, the court expressed empathy for Plaintiff's situation, but stated that it

13  believed that Plaintiff's remedy was a lawsuit for damages against Ocwen rather than relief

14  from foreclosure as to Rushmore because there was no evidence that Rushmore had acted

15  illegally in recording the Notice of Default.

16      53. On December 9, 2019, the court ordered Ocwen to produce all class action

17  settlements and/or settlements with regulators entered into by Ocwen which encompass loans in

18  California that it serviced at any time during the same time frame in which it serviced Plaintiff's

19  loan. Ocwen produced responsive documents in late December of 2019. Those documents

20  indicate that there were regulatory and/or class action settlements for which Plaintiff may have

21  been eligible, but none that specifically provided for a full principal payoff of Plaintiff's loan.

22  Plaintiff was not previously aware of those settlements because the only one he had been told

23  about was a settlement that purportedly paid off his loan in full.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1   54. Plaintiff voluntarily dismissed his case against Rushmore in early January of 2020.

2   Because of the foreclosure moratorium resulting from the COVID 19 pandemic and cooperation

3   from Rushmore and its counsel, Plaintiff was able to sell the property by a consensual sale on

4   August 14, 2020 rather than losing it to foreclosure. However, Plaintiff had to pay Rushmore a

5   total of $673,445.70 on the loan, which was $307,973.80 more than the principal balance owed

6   as of August 2013. Plaintiff also had to give up the home in which he had lived for decades.

### FIRST CAUSE OF ACTION

### FRAUD - INTENTIONAL MISREPRESENTATION

#### (Against All Defendants)

10   55. Plaintiff re-alleges and incorporates by reference each and all of the preceding

11   paragraphs, as if set forth fully herein.

12   56. On or about October of 2013, Ocwen verbally represented to Plaintiff that that no

13   payment was due on the Loan because his loan had been zeroed out due to a global settlement

14   with the government.

15   57. On or about October of 2013, Ocwen represented in writing, on the Ocwen

16   Statement, that $365,471.90 was applied to Plaintiff's loan principal on September 2, 2013,

17   various other fees relating to the loan were waived effective September 2, 2013, and the balance

18   due on the loan as of October 16, 2013 was $0.00.

19   58. On or about January of 2014, Ocwen represented in writing, on the 2013 Form

20   1098, that principal of $370,518.25 was paid on the Loan in 2013.

21   59. Plaintiff is informed and believes, and thereon alleges, that the foregoing

22   representations were false.

23   60. Plaintiff is informed and believes, and thereon alleges, that Ocwen knew that the

24   foregoing representations were false, or that Ocwen made the foregoing representations

25   recklessly, knowing that it did not know whether its representations were true or false, and in

26   conscious disregard of Plaintiff's interests.

27   / / /

28   / / /

61. The true facts were that Ocwen was papering the loan file with purported letters to Plaintiff containing dates between October of 2013 and March of 2017 to make it appear as if Plaintiff's loan was active and Plaintiff was in arrears, without informing Plaintiff that it was doing so. An attorney purporting to represent Ocwen contacted Plaintiff out of the blue, 2 ½ years after the foregoing representations were made, to demand payment in excess of $500,000.00. Ocwen led the subsequent servicers to believe that Plaintiff was in arrears and that he had been unresponsive to Ocwen's purported efforts to contact him. Further, if the settlements Ocwen produced in discovery in Plaintiff's case against Rushmore are complete and fully responsive to Plaintiff's subpoena, then Plaintiff's loan was not zeroed out pursuant to a class action or regulatory settlement.

62. Plaintiff was unaware of the falsity of Ocwen's representations, and believed its representations to be true. Plaintiff's belief was reasonable for several reasons. Specifically, Ocwen provided him with written documentation that his loan had been zeroed out in September of 2013. Ocwen made an official tax filing for 2013 which indicated that the loan principal had been paid in 2013. Ocwen never filed an amended Form 1098 for 2013. Ocwen did not directly contact Plaintiff again. Ocwen's purported counsel did not contact Plaintiff until 2 ½ years after Plaintiff had received the Ocwen Statement, and then ceased contact with Plaintiff after Plaintiff sent him the Ocwen Statement in May of 2016. Ocwen did not record a Notice of Default or commence foreclosure proceedings while it was servicing the Loan. Lastly, there were multiple regulatory settlements with Ocwen in 2013 which provided for Ocwen to pay off loan principal for qualified borrowers. Plaintiff did not know, and still does not know, whether he qualified for relief under one or more of those settlements.

///

///

///

///

///

///

63.  Plaintiff is informed and believes, and thereon alleges, that Ocwen made the foregoing representations with the intent of deceiving Plaintiff so that Plaintiff would not make payments on the Loan, Plaintiff would not pursue a loan modification or refinance, and Plaintiff would not attempt to obtain relief under multiple regulatory and class action settlements for which he was eligible.  As a result, Plaintiff was unable to keep his property and hundreds of thousands of dollars were added to the Loan, thereby causing Ocwen and/or the owners of the Loan to receive significantly more money for the Loan than what they would have otherwise received.

64.  In reliance upon Ocwen's representations, Plaintiff ceased making payments on the Loan and did not pursue his loan modification request or a refinance of the Loan.  Plaintiff also did not inquire into class action and/or regulatory settlements for which he was eligible, nor submit any requests for relief pursuant to those settlements, because he reasonably believed that the Loan had been zeroed out and that it was no longer active.

65.  Plaintiff is informed and believes, and thereon alleges, that he would have qualified for a loan modification and/or for relief under settlements reached with Ocwen which would have significantly reduced his loan principal and monthly payments and allowed him to stay in his home.  Plaintiff is also informed and believes, and thereon alleges, that he would have continued to make the loan payments pursuant to his bankruptcy plan or as otherwise required under a loan modification plan, had he known the true facts.  Plaintiff would have thereby avoided incurring the large amount of interest and other charges which Ocwen and subsequent servicers added to his loan balance, and would have received significantly more equity upon a sale of the property than what he ultimately received.

66.  Plaintiff did not incur damages resulting from Ocwen's misrepresentations until August of 2020, when he was required to pay Rushmore close to double the amount of the monies owed on the Loan as of October of 2013.  Plaintiff did not discover that he was going to incur damages as a result of Ocwen's wrongdoing until November 20, 2019, when the Sacramento County Superior Court denied his motion for a preliminary injunction.

/ / /

67. Plaintiff did not discover that Ocwen had generated letters which made it appear as if the Loan was still active after October of 2013 and put those letters in the loan file, until early August of 2019, when he received the loan file from Rushmore.   Plaintiff did not discover that Ocwen had misled subsequent servicers about the status of the Loan until September of 2019, when Nationstar produced the loan file it had received from Ocwen.

68. Plaintiff did not discover that Ocwen might not have entered into a class action or regulatory settlement in 2013 which provided for a full payoff of his loan principal until late December of 2019, when Ocwen produced the regulatory and class action settlements which it claimed were responsive to Plaintiff's subpoena for such documents.

69. As a direct and proximate result of Ocwen's intentional and/or reckless misrepresentations, alleged herein, Plaintiff has incurred damages in an amount according to proof which he reasonably estimates exceeds $300,000.00.

70. As a direct and proximate result of Ocwen's intentional and/or reckless misrepresentations, Plaintiff incurred significant emotional distress when he was forced out of his home.

71. Ocwen's conduct, in making intentional and/or reckless misrepresentations as alleged herein, was fraudulent, malicious, willful, despicable, and oppressive.  Accordingly, punitive damages are warranted.

## SECOND CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

### (Against All Defendants)

72. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 59 and 61 through 68 above, as if set forth fully herein.

73. Ocwen had insufficient information to ascertain whether its representations were true or false, and consequently made those misrepresentations negligently.

74. As a direct and proximate result of Ocwen's negligent misrepresentations, alleged herein, Plaintiff has incurred damages in an amount according to proof which he reasonably estimates exceeds $300,000.00.

## THIRD CAUSE OF ACTION

## FRAUD-OMISSIONS

### (Against All Defendants)

75. Plaintiff re-alleges and incorporates by reference each and all of the preceding paragraphs, as if set forth fully herein.

76. Plaintiff is informed and believes, and thereon alleges, that Ocwen had exclusive knowledge of past or existing material facts pertaining to the Loan, which were not reasonably accessible to Plaintiff. Accordingly, Ocwen had a duty to disclose those facts to Plaintiff. Ocwen failed to disclose such material facts to Plaintiff, as alleged herein.

77. Ocwen, in the course of making representations of material fact to Plaintiff, suppressed and/or concealed material facts which were necessary to disclose, so that the statements Ocwen made would not be misleading, as alleged herein. As a result of the suppression and concealment of material facts, alleged herein, the statements which Ocwen made were misleading. Consequently, Ocwen is liable for omitting to disclose the material facts as alleged herein.

78. On a continuous basis since February of 2013, Ocwen omitted to disclose the following material facts:

A. It had not transferred Plaintiff's loan to its new servicing platform;

B. It had no idea how much was actually owed on Plaintiff's loan nor any way of reliably ascertaining that information;

C. It had misapplied Plaintiff's post-bankruptcy loan payments in a manner that violated Plaintiff's confirmed bankruptcy plan and caused it to appear as if Plaintiff owed more on the Loan than he actually did;

D. It had generated letters to Plaintiff regarding delinquencies in payments and the forced placement of insurance on the property that were never sent to Plaintiff, and put those letters in the loan file to make it appear as if Plaintiff had ignored dozens of warning letters;

E. It had force-placed hazard insurance on Plaintiff's property on a continuous basis since October of 2013 in excessive amounts, without ever notifying Plaintiff that it intended to

1  do so or had done so, and without first giving Plaintiff the opportunity to provide proof of
2  insurance;

3        F.  It had imposed dozens of "property inspection fees" and added those fees to the
4  loan balance, even though the property is located in a gated community and therefore cannot be
5  "inspected" without Plaintiff's knowledge or consent, which was never granted;

6        G.  It had imposed numerous other unwarranted charges that had been added to
7  Plaintiff's loan balance, including bankruptcy fees that the bankruptcy court had denied,
8  foreclosure fees, and attorneys fees;

9        H.  It had referred the Loan to foreclosure;

10        I.  It had provided inaccurate and/or misleading information about the Loan and its
11  status to the subsequent servicer, Nationstar.

12      79.  Plaintiff is informed and believes, and thereon alleges, that Ocwen knowingly
13  omitted to disclose the above material facts alleged herein with the intent of deceiving and
14  inducing Plaintiff into ceasing to make payments on the Loan, ceasing to pursue a loan
15  modification or refinance, and refraining from attempting to obtain relief under multiple
16  regulatory and class action settlements for which he was eligible, and with the intent of forcing
17  Plaintiff out of his home and substantially increasing the amount Plaintiff would have to pay on
18  the Loan.  As a result, Plaintiff was unable to keep his home and hundreds of thousands of
19  dollars were added to the Loan, thereby causing Ocwen and/or the owners of the Loan to
20  receive significantly more money for the Loan than what they would have otherwise received.

21      80.  Plaintiff was unaware of the true facts.  Plaintiff had no idea, nor any way of
22  knowing, about Ocwen's internal systems problems, or its practice of generating letters that
23  were never sent to him, or of the many unjustified and fraudulent charges that Ocwen was
24  surreptitiously adding to his loan balance, or of the inaccurate statements and omissions which
25  Ocwen had made to Nationstar.

26  / / /
27  / / /
28  / / /

81. As a result of Ocwen's material omissions, alleged herein, Plaintiff ceased making payments on the Loan and did not pursue his loan modification request or a refinance of the Loan. Plaintiff also did not inquire into class action and/or regulatory settlements for which he was eligible, nor submit any requests for relief pursuant to those settlements, because he reasonably believed that the Loan had been zeroed out and that it was no longer active.

82. Plaintiff did not incur damages resulting from Ocwen's material omissions until August of 2020, when he was required to pay Rushmore close to double the amount of the monies owed on the Loan as of October of 2013. Plaintiff did not discover that he was going to incur damages as a result of Ocwen's material omissions until November 20, 2019, when the Sacramento County Superior Court denied his motion for a preliminary injunction.

83. Plaintiff did not discover any of the true facts until early August of 2019, when he received the loan file from Rushmore. Plaintiff did not discover that Ocwen had misled subsequent servicers about the status of the Loan until September of 2019, when Nationstar produced the loan file it had received from Ocwen.

84. As a direct and proximate result of Ocwen's material omissions, alleged herein, Plaintiff has incurred damages in an amount according to proof which he reasonably estimates exceeds $300,000.00.

85. As a direct and proximate result of Ocwen's material omissions, alleged herein, Plaintiff incurred significant emotional distress when he was forced out of his home.

86. Ocwen's conduct, in making material omissions as alleged herein, was fraudulent, malicious, willful, despicable, and oppressive. Accordingly, punitive damages are warranted.

///

///

///

///

///

///

///

## FOURTH CAUSE OF ACTION

## VIOLATION OF CALIFORNIA CIVIL CODE § 2923.6

### (Against All Defendants)

87. Plaintiff re-alleges and incorporates by reference each and all of the preceding paragraphs, as if set forth fully herein.

88. On a continuous basis between August 30, 2013 and March 31, 2017, Ocwen violated California Civil Code Section 2923.6 by engaging in dual tracking. Specifically, Plaintiff submitted a complete loan modification application on August 30, 2013. Nonetheless, Ocwen referred the Loan to foreclosure, and informed Nationstar that the loan was in foreclosure when it sold and/or transferred the servicing rights for the Loan to Nationstar.

89. Ocwen's violations of Cal. Civil Code § 2923.6 caused Plaintiff harm because the lack of communication or a response to his application bolstered and supported Ocwen's representations that Plaintiff's loan was no longer active and that it had been paid off in full due to a regulatory settlement. Had Ocwen timely responded to Plaintiff's loan modification application and/or responded to it at all, Plaintiff would have known that Ocwen still considered the Loan to be active and could have taken timely action to protect his rights and pursued foreclosure prevention alternatives for which he was eligible.

90. As a direct and proximate result of Ocwen's violations of Cal. Civil Code § 2923.6, alleged herein, Plaintiff has incurred damages in an amount according to proof. Plaintiff is entitled to recover such damages from Ocwen pursuant to Cal. Civil Code § 2924.12.

91. Plaintiff did not incur damages resulting from Ocwen's violations of Cal. Civil Code § 2923.6, alleged herein, until August of 2020, when he was required to pay Rushmore close to double the amount of the monies owed on the Loan as of October of 2013. Plaintiff did not discover that he was going to incur damages as a result of Ocwen's violations of Cal. Civil Code § 2923.6, alleged herein, until November 20, 2019, when the Sacramento County Superior Court denied his motion for a preliminary injunction.

/ / /

/ / /

92.  Plaintiff did not discover that Ocwen had engaged in dual tracking in violation of Cal. Civil Code § 2923.6 until September of 2019, when he received the loan file from Nationstar which had been provided to Nationstar by Ocwen.

93. Plaintiff is entitled to recover attorneys fees for Ocwen's violations of Cal. Civil Code § 2923.6, pursuant to Cal. Civil Code § 2924.12(h).

94. Plaintiff is informed and believes, and thereon alleges, that Ocwen's violations of Cal. Civil Code § 2923.6, alleged herein, were intentional, reckless, and/or the result of willful misconduct.  Accordingly, Plaintiff is entitled to recover the greater of treble his actual damages or statutory damages of $50,000.00, pursuant to Cal. Civil Code § 2924.12(a)(2).

## FIFTH CAUSE OF ACTION

## VIOLATION OF CALIFORNIA CIVIL CODE § 2923.7

### (Against All Defendants)

95.  Plaintiff re-alleges and incorporates by reference each and all of the preceding paragraphs, as if set forth fully herein.

96.  On a continuous basis between September of 2013 and March 31, 2017, Ocwen violated California Civil Code § 2923.7 by failing to assign Plaintiff with a single point of contact, despite its purported belief that Plaintiff's loan was in arrears and scheduled for foreclosure, or to notify Plaintiff of the existence and identify of a single point of contact. Ocwen further violated Cal. Civil Code § 2923.7 by failing to: coordinate receipt of all documents associated with available foreclosure prevention alternatives; notify Plaintiff of any missing documents necessary to complete the application; timely, accurately and/or adequately inform Plaintiff of the current status of his loan modification application or his loan; ensure that it had access to current information or personnel sufficient to timely accurate and adequately inform Plaintiff of the current status of his loan modification application and his loan; ensure that Plaintiff was considered for all foreclosure prevention alternatives offered by or through Ocwen; ensure that Plaintiff had access to individuals with the ability and authority to stop foreclosure proceedings; and/or communicate the means by which Plaintiff could apply for

///

1    available foreclosure prevention alternatives and the deadline for any required submissions to be
2    considered for those options.

3        97.  Ocwen's violations of Cal. Civil Code § 2923.7 caused Plaintiff harm because the
4    lack of assignment to or communication of a single point of contact and its other violations of
5    Cal. Civil Code § 2923.7 bolstered and supported Ocwen's representations that Plaintiff's loan
6    was no longer active and that it had been paid off in full due to a regulatory settlement.  Had
7    Ocwen timely assigned Plaintiff to a single point of contact and notified Plaintiff of that
8    assignment, and/or complied with its other obligations under Cal. Civil Code § 2923.7, then
9    Plaintiff would have known that Ocwen still considered the Loan to be active and could have
10   taken timely action to protect his rights and pursue foreclosure prevention alternatives for which
11   he was eligible.

12       98.  As a direct and proximate result of Ocwen's violations of Cal. Civil Code § 2923.7,
13   alleged herein, Plaintiff has incurred damages in an amount according to proof.  Plaintiff is
14   entitled to recover such damages from Ocwen pursuant to Cal. Civil Code § 2924.12.

15       99.  Plaintiff did not incur damages resulting from Ocwen's violations of Cal. Civil
16   Code § 2923.7, alleged herein, until August of 2020, when he was required to pay Rushmore
17   close to double the amount of the monies owed on the Loan as of October of 2013.  Plaintiff did
18   not discover that he was going to incur damages as a result of Ocwen's violations of Cal. Civil
19   Code § 2923.7, alleged herein, until November 20, 2019, when the Sacramento County Superior
20   Court denied his motion for a preliminary injunction.

21       100.  Plaintiff did not discover that Ocwen had papered his file with numerous letters
22   that are part of the foreclosure process, referred the Loan to foreclosure, and/or informed the
23   subsequent servicer that Plaintiff was in arrears and that the Loan was in foreclosure until early
24   August of 2019, when he received the loan file from Rushmore.

25       101.  Plaintiff is entitled to recover attorneys fees for Ocwen's violations of Cal. Civil
26   Code § 2923.7, pursuant to Cal. Civil Code § 2924.12(h).

27   / / /
28   / / /

1    102.  Plaintiff is informed and believes, and thereon alleges, that Ocwen's violations of
2    Cal. Civil Code § 2923.7, alleged herein, were intentional, reckless, and/or the result of willful
3    misconduct.  Accordingly, Plaintiff is entitled to recover the greater of treble his actual damages
4    or statutory damages of $50,000.00, pursuant to Cal. Civil Code § 2924.12(a)(2).

5    ## SIXTH CAUSE OF ACTION

6    ## VIOLATION OF CALIFORNIA CIVIL CODE § 2924.10

7    **(Against All Defendants)**

8    103.  Plaintiff re-alleges and incorporates by reference each and all of the preceding
9    paragraphs, as if set forth fully herein.

10    104.  On a continuous basis between September of 2013 and March 31, 2017, Ocwen
11    violated California Civil Code § 2924.10 by failing to acknowledge receipt of Plaintiff's loan
12    modification request, failing to provide an estimate of when a decision would be made on the
13    loan modification application, failing to provide an expiration date for submitted documents,
14    failing to advise Plaintiff of any deficiencies in the loan modification application, and failing to
15    advise Plaintiff of the deadlines to submit missing documents.

16    105.  Ocwen's violations of Cal. Civil Code § 2924.10 caused Plaintiff harm because the
17    lack of communication or a response to his application bolstered and supported Ocwen's
18    representations that Plaintiff's loan was no longer active and that it had been paid off in full due
19    to a regulatory settlement.  Had Ocwen timely responded to Plaintiff's loan modification
20    application and/or advised him of any deadlines or deficiencies, then Plaintiff would have
21    known that Ocwen still considered the Loan to be active and could have timely corrected the
22    purported deficiencies or taken timely action to protect his rights and pursue foreclosure
23    prevention alternatives for which he was eligible.

24    106.  As a direct and proximate result of Ocwen's violations of Cal. Civil Code §
25    2924.10, alleged herein, Plaintiff has incurred damages in an amount according to proof.
26    Plaintiff is entitled to recover such damages from Ocwen pursuant to Cal. Civil Code § 2924.12.
27    ///
28    ///

107. Plaintiff did not incur damages resulting from Ocwen's violations of Cal. Civil Code § 2924.10, alleged herein, until August of 2020, when he was required to pay Rushmore close to double the amount of the monies owed on the Loan as of October of 2013. Plaintiff did not discover that he was going to incur damages as a result of Ocwen's violations of Cal. Civil Code § 2924.10, alleged herein, until November 20, 2019, when the Sacramento County Superior Court denied his motion for a preliminary injunction.

108. Plaintiff did not discover that Ocwen had papered his file with numerous letters that are part of the foreclosure process, referred the Loan to foreclosure, and/or informed the subsequent servicer that Plaintiff was in arrears and that the Loan was in foreclosure until early August of 2019, when he received the loan file from Rushmore.

109. Plaintiff is entitled to recover attorneys fees for Ocwen's violations of Cal. Civil Code § 2924.10, pursuant to Cal. Civil Code § 2924.12(h).

110. Plaintiff is informed and believes, and thereon alleges, that Ocwen's violations of Cal. Civil Code § 2924.10, alleged herein, were intentional, reckless, and/or the result of willful misconduct. Accordingly, Plaintiff is entitled to recover the greater of treble his actual damages or statutory damages of $50,000.00, pursuant to Cal. Civil Code § 2924.12(a)(2).

**SEVENTH CAUSE OF ACTION**

**VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT**

**("RESPA")**

**(Against All Defendants)**

111. Plaintiff re-alleges and incorporates by reference each and all of the preceding paragraphs, as if set forth fully herein.

112. On a continuous basis after May 20, 2016, Ocwen violated Section 12 CFR 1024.35(e) of the RESPA by failing to conduct a reasonable investigation of the events and allegations set forth in the complaint Plaintiff filed with the CFPB.

113. On a continuous basis between September 1, 2013 and March 31, 2017, Ocwen violated Section 12 CFR 1024.37 of the RESPA by: force-placing hazard insurance on Plaintiff's property when it had no reasonable basis to believe that Plaintiff had failed to

maintain required hazard insurance; failing to mail or deliver an initial written notice to Plaintiff at least 45 days before assessing charges or fees relating to force-placed insurance; failing to send Plaintiff a reminder notice at least 30 days after the initial notice was mailed and at least 15 days before the fees and charges were assessed; failing to provide advance written notice at least 45 days prior to renewing the force-placed insurance; and imposing unreasonable charges for the force-placed insurance that were significantly higher than the amount Plaintiff paid for the homeowners insurance that he maintained at all relevant times.

114. On a continuous basis between September 1, 2013 and March 31, 2017, Ocwen violated Section 12 CFR 1024.38(b) of the RESPA by failing to have policies and procedures in place that were reasonably designed to ensure that it could: a) provide timely and accurate information to Plaintiff; b) investigate, respond to and make corrections in response to Plaintiff's complaints and inquiries; c) provide Plaintiff with accurate and timely information and documents in response to his requests for information; d) provide the owners of the Loan with accurate information and documents regarding the Loan, including, but not limited to, the terms of Plaintiff's confirmed bankruptcy plan; e) properly evaluate loss mitigation applications; f) facilitate oversight of and compliance by its personnel; g) timely and accurately transfer all information and documents in its possession and control related to a transferred mortgage loan to the transferee servicer; and reasonably inform Plaintiff of the procedures for submitting written error notices or written information requests.

115. On a continuous basis between September 1, 2013 and March 31, 2017, Ocwen violated Section 12 CFR 1024.39(a) of the RESPA by failing to make good faith efforts to establish live contact with Plaintiff by no later than the 36th day of his alleged delinquency and by failing to inform him of any loss mitigation options.

116. On a continuous basis between September 1, 2013 and March 31, 2017, Ocwen violated Section 12 CFR 1024.39(b) of the RESPA by failing to send Plaintiff written notice that he was delinquent on his loan within 45 days of when it alleges he became delinquent and failing to provide any information about loss mitigation options and counseling. Ocwen was required to comply with these early intervention requirements because Plaintiff's bankruptcy

1  plan was confirmed and his bankruptcy case closed before Ocwen became the servicer of the
2  Loan.

3      117.  On a continuous basis between September 1, 2013 and March 31, 2017, Ocwen
4  violated Section 12 CFR 1024.40 of the RESPA by: a) failing to maintain policies and
5  procedures to facilitate continuity of contact between Ocwen and Plaintiff; b) failing to assign
6  personnel to Plaintiff who were available by telephone to answer questions and assist him with
7  available loss mitigation options; c) failing to have policies and procedures that were reasonably
8  designed to ensure that Ocwen could provide a live response to Plaintiff in a timely manner; d)
9  failing to maintain policies and procedures that were reasonably designed to ensure that the
10  assigned personnel could provide Plaintiff with accurate information about loss mitigation
11  options, actions he needed to take to be evaluated for such options, the status of his loss
12  mitigation application, the circumstances under which his account could be referred to
13  foreclosure, and any loss mitigation deadlines; and e) failing to have policies and procedures
14  that were reasonably designed to ensure that the assigned personnel were able to timely retrieve
15  a complete record of Plaintiff's payment history and all written information he had provided to
16  the servicer in connection with his loss mitigation application, provide these documents to other
17  people required to evaluate Plaintiff for loss mitigation options, and provide Plaintiff with
18  information about submitting an error notice or information request.

19      118.  On a continuous basis between September 1, 2013 and March 31, 2017, Ocwen
20  violated Section 12 CFR 1024.41 of the RESPA by: a) failing to promptly review Plaintiff's
21  loan modification application to determine if it was complete; b) failing to notify Plaintiff that
22  the application was incomplete; c) failing to advise Plaintiff of any additional documents or
23  information that was missing needed and of a reasonable deadline to submit those documents;
24  d) failing to exercise reasonable diligence to obtain any missing documents and information; e)
25  failing to evaluate Plaintiff for all available loss mitigation options; and f) failing to provide
26  Plaintiff with written notice stating the loss mitigation options it would offer.
27  / / /
28  / / /

119.  Ocwen's violations of the RESPA caused Plaintiff harm because its inaccurate representations, its subsequent lack of communication, and its failure to respond to his loan modification application bolstered and supported Ocwen's representations that Plaintiff's loan was no longer active and that it had been paid off in full due to a regulatory settlement.  Had Ocwen timely communicated with Plaintiff, or timely responded to Plaintiff's loan modification application, and/or advised him of any deadlines, deficiencies, and/or delinquencies, then Plaintiff would have known that Ocwen still considered the Loan to be active and could have timely corrected the purported deficiencies or taken timely action to protect his rights and pursue foreclosure prevention alternatives for which he was eligible.

120.  As a direct and proximate result of Ocwen's violations of RESPA, alleged herein, Plaintiff has incurred damages in an amount according to proof.

121.  Plaintiff did not incur damages resulting from Ocwen's violations of RESPA, alleged herein, until August of 2020, when he was required to pay Rushmore close to double the amount of the monies owed on the Loan as of October of 2013.  Plaintiff did not discover that he was going to lose his home or incur damages as a result of Ocwen's violations of RESPA, alleged herein, until November 20, 2019, when the Sacramento County Superior Court denied his motion for a preliminary injunction.

122.  Plaintiff first learned that Ocwen had failed to conduct a reasonable investigation of his CFPB complaint in October 2019 when he received Ocwen's files in response to his subpoena.

123.  Plaintiff first learned that Ocwen had force-placed insurance on his property in August of 2019, when Rushmore produced his loan file.  Likewise, Plaintiff first learned that Ocwen had papered his file with numerous letters that are part of the foreclosure process, referred the Loan to foreclosure, and informed the subsequent servicer that Plaintiff was in arrears and that the Loan was in foreclosure in early August of 2019, when he received the loan file from Rushmore.  Plaintiff first learned that Ocwen had violated RESPA with respect to its policies and procedures in September of 2019, when his counsel learned of the CFPB's 2017 complaint against Ocwen and the findings made therein.

## EIGHTH CAUSE OF ACTION

## NEGLIGENCE

### (Against All Defendants)

124. Plaintiff re-alleges and incorporates by reference each and all of the preceding paragraphs, as if set forth fully herein.

125. Ocwen, as the servicer of the Loan, had a legal duty to act with reasonable care with respect to its servicing activities and obligations. Ocwen also had a legal duty to comply with all applicable laws, including the California Homeowner's Bill of Rights and the RESPA. Ocwen owed a duty of care, as the servicer of the Loan, to provide accurate and adequate information to Plaintiff regarding the balance owed on the Loan, to accurately apply the loan payments Plaintiff made, to timely act on Plaintiff's loan modification request, and to take reasonable steps to avoid having the Loan go into foreclosure.

126. On an ongoing basis between September of 2013 and March 31, 2017, Ocwen breached its duties to Plaintiff in each and all of the foregoing respects:

A. Ocwen failed to accurately communicate the balance owed on the Loan to Plaintiff and instead provided him with incorrect information regarding the loan balance;

B. Ocwen failed to timely notify Plaintiff that the Loan was in arrears;

C. Ocwen failed to notify Plaintiff that it had referred the Loan to foreclosure;

D. Ocwen failed to notify Plaintiff that it required evidence of homeowners insurance or to provide Plaintiff with a reasonable opportunity to submit evidence that he carried homeowners insurance;

E. Ocwen failed to notify Plaintiff that it had force-placed insurance on the property.

F. Ocwen force-placed insurance on the property for an excessive cost which significantly exceeded the amount Plaintiff was paying for insurance and then added those costs to the loan balance;

G. Ocwen failed to accurately ascertain the amount that was owed on the Loan;

/ / /

H.  Ocwen failed to transfer the Loan to its new servicing platform and/or failed to timely transfer the Loan to its new servicing platform;

I.  Ocwen mis-applied the post-bankruptcy loan payments Plaintiff made in a manner that violated the terms of his confirmed bankruptcy plan;

J.  Ocwen generated letters to Plaintiff advising him of purported delinquencies and arrears that were placed in the loan file, but never sent to Plaintiff;

K.  Ocwen failed to communicate with Plaintiff after October of 2013;

L.  Ocwen imposed dozens of "property inspection fees" and added those fees to the loan balance, even though the property is located in a gated community and therefore could not be "inspected" without Plaintiff's knowledge or consent, which was never granted;

M.  Ocwen imposed numerous other unwarranted charges and added those charges to the loan balance, including bankruptcy fees which the bankruptcy court had disallowed, foreclosure fees, and attorneys fees;

N.  Ocwen referred the Loan to foreclosure without providing Plaintiff with any reasonable opportunity to pursue any foreclosure prevention alternatives and without notifying Plaintiff that it had done so;

O.  Ocwen failed to ever take any action on Plaintiff's loan modification application or to notify him that it was incomplete;

P.  Ocwen provided inaccurate and/or misleading information about the Loan and its status to the subsequent servicer, Nationstar; and

Q.  Ocwen failed to properly or reasonably investigate Plaintiff's CFPB complaint.

127.  Ocwen's conduct in servicing the Loan was intended to affect Plaintiff because he was the borrower on the Loan.  It was foreseeable that Ocwen's conduct would cause Plaintiff harm because it caused his loan balance to balloon and Plaintiff's home to be put into foreclosure.  Plaintiff did suffer harm because he had to pay a huge amount of interest, fees and penalties on the Loan that he would not have incurred had Ocwen acted with reasonable care, and was forced to sell his house under duress in order to avoid foreclosure.  Ocwen's

1    conduct was morally blameworthy because it violated numerous laws and was completely

2    unjustified and unreasonable.

3        128. Ocwen, in breaching its duties and professional obligations as described above,

4    failed to exercise reasonable care and to act with reasonable diligence. Instead, Ocwen acted

5    negligently and carelessly and in disregard of its professional obligations and duties.

6        129. As a direct and proximate result of Ocwen's negligence, alleged herein, Plaintiff is

7    entitled to damages in an amount according to proof.

8        130. Plaintiff did not incur damages resulting from Ocwen's negligence until August of

9    2020, when he was required to pay Rushmore close to double the amount of the monies owed

10   on the Loan as of October of 2013. Plaintiff did not discover that he was going to incur

11   damages as a result of Ocwen's negligence until November 20, 2019, when the Sacramento

12   County Superior Court denied his motion for a preliminary injunction.

13       131. Plaintiff did not discover the true facts regarding Ocwen's breaches of duty,

14   alleged herein, until early August of 2019, when he received the loan file from Rushmore.

15   Plaintiff did not discover that Ocwen had misled subsequent servicers about the status of the

16   Loan until September of 2019, when Nationstar produced the loan file it had received from

17   Ocwen. Plaintiff first learned that Ocwen had failed to conduct a reasonable investigation of his

18   CFPB complaint in October 2019 when he received Ocwen's files in response to his subpoena.

19       **WHEREFORE**, Plaintiff prays judgment as follows:

20       1. For compensatory damages in an amount according to proof;

21       2. For damages in an amount according to proof for emotional distress;

22       3. For punitive and exemplary damages in an amount sufficient to dissuade Ocwen from

23   repeating its misconduct, and to serve as an example to similarly situated Defendants;

24       4. For reasonable attorneys fees pursuant to Cal. Civil Code § 2924.12(h);

25       5. For the greater of treble Plaintiff's actual damages or statutory damages of

26   $50,000.00, pursuant to Cal. Civil Code § 2924.12(a)(2);

27       6. For costs of suit herein; and

28       7. For such other and further relief as this honorable court may deem just and proper.

Date:                                    **LAW OFFICES OF MELINDA JANE STEUER**

                                    By:    /s/ Melinda Jane Steuer
                                          Melinda Jane Steuer
                                          Attorney for Plaintiff

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims triable by jury.

Date:                                    **LAW OFFICES OF MELINDA JANE STEUER**

                                    By:   /s/ Melinda Jane Steuer
                                          Melinda Jane Steuer
                                          Attorney for Plaintiff

# EXHIBIT 1



# Ocwen Loan Servicing®
### Mortgage Customers

**O C W E N**

| | | | |
|---|---|---|---|
| Account Number | 7400956249 | Loan Type | 30 year FIXED |
| Original Loan Date | 03/12/2004 | Property Address | 2062 EMPIRE MINE CIRCLE |
| Original Loan Amount | $381,000.00 | | GOLD RIVER CA 95670 |
| Balance as of 10/16/2013 | $0.00 | | |

| Date | Description | Monthly Payment | Applied to Principal | Applied to Interest | Applied to Escrow | Addl Products | Late Charges | Other |
|---|---|---|---|---|---|---|---|---|
| 09/02/2013 | Fee Waived | ($103.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($103.00) |
| 09/02/2013 | Fee Waived | ($83.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($83.00) |
| 09/02/2013 | Fee Waived | ($200.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($200.00) |
| 09/02/2013 | Fee Waived | ($650.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($650.00) |
| 09/02/2013 | Fee Waived | ($150.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($150.00) |
| 09/02/2013 | Fee Waived | ($100.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($100.00) |
| 09/02/2013 | Fee Waived | ($150.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($150.00) |
| 09/02/2013 | Fee Waived | ($650.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($650.00) |
| 09/02/2013 | Fee Waived | ($11.25) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($11.25) |
| 09/02/2013 | Fee Waived | ($11.25) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($11.25) |
| 09/02/2013 | Fee Waived | ($20.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($20.00) |
| 09/02/2013 | Fee Waived | ($11.25) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($11.25) |
| 09/02/2013 | Fee Waived | ($15.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($15.00) |
| 09/02/2013 | Fee Waived | ($15.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($15.00) |
| 09/02/2013 | Service Released | $0.00 | $365,471.90 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08/12/2013 | Payment | $3,300.36 | $641.63 | $1,792.43 | $866.30 | $0.00 | $0.00 | $0.00 |
| 07/09/2013 | Payment | $3,300.36 | $638.50 | $1,795.56 | $866.30 | $0.00 | $0.00 | $0.00 |
| 06/07/2013 | Payment | $3,300.36 | $635.39 | $1,798.67 | $866.30 | $0.00 | $0.00 | $0.00 |
| 05/15/2013 | Payment | $3,300.36 | $632.30 | $1,801.76 | $866.30 | $0.00 | $0.00 | $0.00 |
| 04/08/2013 | Payment | $3,099.55 | $629.22 | $1,804.84 | $665.49 | $0.00 | $0.00 | $0.00 |
| 03/14/2013 | County Tax Paid | ($4,135.83) | $0.00 | $0.00 | ($4,135.83) | $0.00 | $0.00 | $0.00 |
| 03/13/2013 | Payment | $3,099.55 | $626.15 | $1,807.91 | $665.49 | $0.00 | $0.00 | $0.00 |
| 02/08/2013 | Payment | $3,099.55 | $623.10 | $1,810.96 | $665.49 | $0.00 | $0.00 | $0.00 |
| 01/09/2013 | Payment | $3,099.55 | $620.06 | $1,814.00 | $665.49 | $0.00 | $0.00 | $0.00 |
| 12/14/2012 | Receipt | ($3,099.55) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/14/2012 | Payment | $3,099.55 | $617.04 | $1,817.02 | $665.49 | $0.00 | $0.00 | $0.00 |
| 12/13/2012 | Receipt | $3,099.55 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Received from Ocwen
October 2013

CN

# EXHIBIT 2

# Mortgage Interest Statement SUBSTITUTE FORM 1098 (keep for your records).

RECIPIENT'S/LENDER'S name, street address and telephone number
OCWEN LOAN SERVICING, LLC
P.O. Box 24646
West Palm Beach, FL 33416-4646

If you have any questions, call toll-free 1-800-746-2936

**Copy B For Payer**
The information in boxes 1, 2, 3, and 4 is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if the IRS determines that an underpayment of tax results because you overstated a deduction for this mortgage interest or for these points or because you did not report this refund of interest on your return.

* Caution: The amount shown may not be fully deductible by you. Limits based on the loan amount and the cost and value of the secured property may apply. Also, you may only deduct interest to the extent it was incurred by you, actually paid by you, and not reimbursed by another person

Department of the Treasury - Internal Revenue Service

PAYER'S/BORROWER'S name, street address (including apt. no.), city, state and ZIP code

CARL E NELSON
2062 EMPIRE MINE CIRCLE
GOLD RIVER CA 95670-7728



| RECIPIENTS Federal ID Number | PAYERS Social Security Number | OMB 1545-0901 |
|---|---|---|
| 01-0681100 | XXX-XX-5964 | 2013 IRS REPORTING YEAR |

| 1 Mortgage interest received from Payer(s)/Borrower(s)* | 2 Points paid directly by Payer(s)/Borrowers on purchase of principal residence |
|---|---|
| $ 14,426.13 | $ 0.00 |

| 3 Refund of Overpaid Interest (see box 3 on back) | 4 Mortgage Insurance Premiums |
|---|---|
| $ 0.00 | $ 0.00 |

| 5 Real estate taxes paid |
|---|
| $ 4,135.83 |

STATEMENT OF ACCOUNT THROUGH 12-31-2013
ACCOUNT NUMBER: 7400956249

| | |
|---|---|
| INTEREST PAID DURING 2013: | 14,426.13 |
| PRINCIPAL PAID DURING 2013: | 370,518.25 |
| LATE CHARGES PAID DURING 2013: | 0.00 |
| INTEREST ON ESCROW 2013: | 0.00 |
| PRIOR YEAR PREPAID INTEREST: | 0.00 |
| TOTAL ESCROW DEPOSITS: | 6,127.16 |
| TOTAL ESCROW DISBURSEMENTS: | 4,135.83 |

| DATE OF TRANSACTION | TRANSACTION DESCRIPTION | DISTRIBUTION OF TRANSACTION | | | | PRINCIPAL BALANCE | ESCROW BALANCE |
|---|---|---|---|---|---|---|---|
| | | PRINCIPAL | INTEREST | ESCROW | MISC | | |
| 01-09-13 | PAYMENT | 620.08 | 1,814.00 | 665.49 | 0.00 | 369,898.19 | 17,130.08- |
| 02-08-13 | PAYMENT | 623.10 | 1,810.98 | 665.49 | 0.00 | 369,275.09 | 16,464.59- |
| 03-13-13 | PAYMENT | 626.15 | 1,807.91 | 665.49 | 0.00 | 388,648.94 | 15,799.10- |
| 03-14-13 | COUNTY TAX PD | 0.00 | 0.00 | 4,135.83- | 0.00 | 388,648.94 | 19,934.93- |
| 04-08-13 | PAYMENT | 629.22 | 1,804.84 | 665.49 | 0.00 | 388,019.72 | 19,269.44- |
| 05-15-13 | PAYMENT | 632.30 | 1,801.76 | 866.30 | 0.00 | 367,387.42 | 18,403.14- |
| 06-07-13 | PAYMENT | 635.39 | 1,798.67 | 866.30 | 0.00 | 386,752.03 | 17,536.84- |
| 07-09-13 | PAYMENT | 638.50 | 1,795.56 | 866.30 | 0.00 | 386,113.53 | 16,670.54- |
| 08-12-13 | PAYMENT | 641.63 | 1,792.43 | 866.30 | 0.00 | 385,471.90 | 15,804.24- |
| 09-02-13 | LOAN TRANSFER | 0.00 | 0.00 | 15,804.24 | 1,028.80- | 385,471.90 | 0.00 |
| 09-02-13 | LOAN TRANSFER | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 15.00- | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 15.00- | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 11.25- | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 20.00- | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 11.25- | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 11.25- | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 650.00- | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 150.00- | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 100.00- | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 150.00- | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 650.00- | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 200.00- | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 83.00- | 0.00 | 0.00 |
| 09-02-13 | FEE WAIVED | 0.00 | 0.00 | 0.00 | 103.00- | 0.00 | 0.00 |

This is your year-end information for 2013. This is the only report you will receive from us for the purpose of Federal and State Tax reporting. Important instructions follow that should be retained for reference.

**PLEASE VERIFY THE SOCIAL SECURITY/TAX ID NUMBER SHOWN ON THE REVERSE SIDE OF THIS FORM.**

A person (including a financial institution, a governmental unit, and a cooperative housing corporation) who is engaged in a trade or business and, in the course of such trade or business, received from you at least $600 of mortgage interest (including certain points) on any one mortgage in the calendar year must furnish this statement to you.

If you received this statement as the payer of record on a mortgage on which there are other borrowers, furnish each of the other borrowers with information about the proper distribution of amounts reported on this form. Each borrower is entitled to deduct only the amount he or she paid and points paid by the seller that represent his or her share of the amount allowable as a deduction. Each borrower may have to include in income a share of any amount reported in box 3.

If your mortgage payments were subsidized by a government agency, you may not be able to deduct the amount of the subsidy. See the instructions for Form 1040, Schedule A, C, or E for how to report the mortgage interest. Also, for more information, see Pub. 936 and Pub. 535.

**Payer's/Borrower's identification number.** For your protection, this form may show only the last four digits of your social security number (SSN), individual taxpayer identification number (ITIN), or adoption taxpayer identification number (ATIN). However, the issuer has reported your complete identification number to the IRS, and, where applicable, to state and/or local governments.

**Account number.** May show an account or other unique number the lender has assigned to distinguish your account.

**Box 1.** Shows the mortgage interest received by the recipient/lender during the year. This amount includes interest on any obligation secured by real property, including a home equity, line of credit, or credit card loan. This amount does not include points, government subsidy payments, or seller payments on a "buydown" mortgage. Such amounts are deductible by you only in certain circumstances. **Caution:** If you prepaid interest in 2013 that accrued in full by January 15, 2014, this prepaid interest may be included in box 1. However, you cannot deduct the prepaid amount in 2013 even though it may be included in box 1. If you hold a mortgage credit certificate and can claim the mortgage interest credit, see Form 8396. If the interest was paid on a mortgage, home equity, line of credit, or credit card loan secured by your personal residence, you may be subject to a deduction limitation.

**Box 2.** Not all points are reportable to you. Box 2 shows points you or the seller paid this year for the purchase of your principal residence that are required to be reported to you. Generally, these points are fully deductible in the year paid, but you must subtract seller-paid points from the basis of your residence. Other points not reported in box 2 may also be deductible. See Pub. 936 to figure the amount you can deduct.

**Box 3. Do not deduct this amount.** It is a refund (or credit) for overpayment(s) of interest you made in a prior year or years. If you itemized deductions in the year(s) you paid the interest, you may have to include part or all of the box 3 amount on the "Other income" line of your 2013 Form 1040. No adjustment to your prior year(s) tax return(s) is necessary. For more information, see Pub. 936 and Itemized Deduction Recoveries in Pub. 525.

**Box 4.** Shows mortgage insurance premiums which may qualify to be treated as deductible mortgage interest. See the Schedule A (Form 1040) instructions.

**Box 5.** The interest recipient may use this box to give you other information, such as the address of the property that secures the debt, real estate taxes, or insurance paid from escrow.

**Future developments.** For the latest information about developments related to Form 1098 and its instructions, such as legislation enacted after they were published, go to www.irs.gov/form1098.